Patterson, Guardian, Appellant, *v.* Snider et ux.

Argued October 6, 1931. Before FRAZER, C. J., WALL-ING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

*Clarence A. Patterson,* with him *J. Clyde Gilfillan,* of *Gilfillan & Patterson,* for appellant.—The evidence is sufficient to support the finding of the jury that there was a lack of contractual capacity: Dunbar v. Preston, 285 Pa. 502; Mitchell v. New Castle, 275 Pa. 426; Fluke v. Lang, 283 Pa. 54; Statler v. R. R., 296 Pa. 222; Conners v. Dempsey, 303 Pa. 128; Roche v. Wegge, 202 Pa. 169; Newhard v. Yundt, 132 Pa. 324; Irish v. Smith, 8 S. & R. 573; Wilkinson v. Pearson, 23 Pa. 117; Hepler v. Hosack, 197 Pa. 631; Moorhead v. Scovel, 210 Pa. 446; Bricker v. Lightner, 40 Pa. 199; Taylor v. Com.,

109 Pa. 262; Nonemacher v. Nonemacher, 159 Pa. 634; Herster v. Herster, 122 Pa. 239.

*W. Walter Braham*, of *Aiken & Braham*, with him *Charles R. Davis, Wm. D. Cobau* and *J. Glenn Berry*, for appellee.—The lower court correctly entered judgment n. o. v. for defendants on the whole record: Elcessor v. Elcessor, 146 Pa. 359; First Nat. Bank v. Wirebach, 12 W. N. C. 150; Nonemacher v. Nonemacher, 159 Pa. 634; Null's Est., 302 Pa. 64; Central Guaranty Trust v. White, 206 Pa. 611; Hamilton v. Fay, 283 Pa. 175; Kraus v. Stein, 173 Pa. 221; Lawrence's Est., 286 Pa. 58; Leisey's Est., 280 Pa. 533.

OPINION BY MR. JUSTICE MAXEY, November 23, 1931:

The issue in this case is whether the plaintiff's ward, an aged man, had contractual capacity when he entered into an agreement with the defendants, husband and wife, by which agreement he gave to them $3,500 to pay off the indebtedness on their home, in gratitude for the care and attention he had received from them and in consideration of the continued care they agreed to give him.

The action was assumpsit by the guardian against the husband and wife to recover the $3,500. The jury found in favor of the guardian. The court below entered judgment for the defendants non obstante veredicto.

Hiram Holliday, the ward, was for about forty years employed by the Pennsylvania Railroad Company as a janitor in its division office building in Allegheny County. In 1920, he took up his abode with the defendants because he "was unable to get along" with his married son with whom he had resided. He remained with the defendants until December 9, 1929, when he was adjudged feeble minded and S. E. Patterson, the plaintiff, was appointed his guardian. During this nine-year period he paid the defendants for his room and board a monthly sum of from $35 to $40. Holliday was pen-

sioned by the Pennsylvania Railroad in 1925. He had accumulated several pieces of rented real estate and a savings account of about $10,000.

In 1927 Mr. and Mrs. Snider purchased a new home and when they suggested to Holliday that he ought to find new quarters because they were going to move and "they thought the distance [from the new home] was a little too far for him at his age," he expressed a preference to remain with them. In the early part of 1929 Mr. Snider lost his position and his health failed. Payments were due on their home and there loomed before them a prospect of losing their property. Holliday, being acquainted with the problem confronting them, said he wanted to help and offered the sum necessary to make the payment due on their property. This sum was $3,500. He indicated that he wished to do this as a mark of appreciation of their many kind acts to him and in consideration of their continuing to permit him to board and lodge with them. Snider then suggested that they go to an attorney to have the necessary papers drawn, and they went to Holliday's attorney, Clyde V. Ailey, a reputable member of the bar and a former district attorney of Lawrence County. Mr. Ailey drafted the agreement now challenged. The testimony as to what took place in the lawyer's office is uncontradicted. The agreement was dictated in the presence of Holliday and it was read aloud by the stenographer. A day or two later the agreement was typed and read to Mr. and Mrs. Snider and to Holliday. Mr. Ailey testified thus: "As I read along I called Mr. Holliday's attention to the provisions and explained the words as nearly as I could, so that he should understand the terms of it. He said, 'It's the way I want it; go ahead and sign it up.'" It is also in evidence that Holliday clearly understood the transaction because the plaintiff and one of his witnesses both testified that some months afterwards Holliday discussed the gift with them.

Plaintiff's witnesses held responsible positions with the Pennsylvania Railroad Company and had shown a friendly interest in Holliday's financial affairs, being anxious that he take proper care of his money. While they met him frequently, these meetings were of brief duration and their conversation with him was meager. These witnesses were permitted to express an opinion as to the mental competency of Holliday on March 4, 1929, the day of the agreement, although not one of them testified to having seen him at that time. The witnesses for the defendants consisted of Holliday's physician, his friend, the watchman Noble, with whom he spent many hours daily, his attorney, and others who were well enough acquainted with him to form opinions as to his mental condition. They all certified as to his mental competency at the time he entered into the agreement.

The burden of proving Holliday's contractual incapacity was upon the plaintiff. In Hamilton et al. v. Fay, 283 Pa. 175, 178, this court said: "Sanity and mental capacity are presumed and the burden is on him who alleges the contrary. 'Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful, but in a positive manner [although not necessarily by positive evidence]': Grubbs v. McDonald, 91 Pa. 236; Palmer's Est., 219 Pa. 303, 310." In Elcessor et al. v. Elcessor, 146 Pa. 359, this court held that evidence to prove mental incapacity must be "clear and unquestionable."

The basic facts testified to by the plaintiff's witnesses were that Holliday was an old man, illiterate, unable to transact business, weak in memory, and a sloven in dress. All this evidence, if true, is much below the legal standard of required proof in such cases. Not only did plaintiff's proof fail, but defendants' proof established unequivocally the contractual capacity of Holliday at the time he executed the agreement in controversy.

We agree with the learned judge of the court below that: "While mental incapacity may be proven by the opinions of the witnesses who knew the party whose capacity is questioned, those opinions must be founded on facts first given to the jury by the witness and tending to support the opinion expressed. The facts testified to by plaintiff's witnesses, do not point to unsoundness of mind with any degree of certainty. Plaintiff's evidence falls far short of being positive, clear and unquestionable."

The agreement made by Holliday was a natural and rational one for him to make under the circumstances. In the setting of the evidence now before us this agreement suggests no obliquity or over-reaching on the part of the defendants. If an aged parent made such an agreement with or such a gift to a son or daughter who had cared for him and who was continuing to do so, no one would consider it unusual or improper. Many aged people have been accorded by those unbound to them by kindred ties, a tender care which their own flesh and blood have denied them. As a total stranger proved himself a "neighbor" to him who had "fallen among thieves," so a stranger to the blood may be "neighbor" and "keeper" to him around whom have gathered the infirmities of age.

The judgment of the court below was in accordance not only with the evidence but with manifest justice. It is affirmed.